

2:18-cv-00768

**Peter Mwithiga**
**935 Radkovich Avenue**
**Las Vega NV 89119**
**602-486-7382**
**pmwithiga@gmail.com**

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEVADA

------------------------------------------------------x
---

PETER MWITHIGA

              Plaintiff,

v.

UBER TECHNOLOGIES aka UBER aka UBER

PARTNERS 160 GREENTREE DR STE 101,

DOVER, DE 19904

              Defendant

------------------------------------------------------x
---

: **AMMENDED COMPLAINT FOR**

: **DETRIMENTAL RELIANCE; BREACH OF**

: **CONTRACT; FRAUDULENT**

: **INDUCEMENT; ECONOMIC DURESS;**

: **WILLFUL VIOLATION OF 29 U.S.C.A §**

: **206; FRAUD; WILLFUL VIOLATION OF**

: **THE FEDERAL OCCUPATIONAL SAFETY**

: **AND HEALTH ACT (OSHA); FRAUD;**

. **WRONGFUL TERMINATION; AND**

**EMBEZZLEMENT**

NOW COMES Peter Mwithiga, Plaintiff in this case, and for cause of action would show unto the Court the following:

### PARTIES

    a. Plaintiff is a resident of Nevada.

b.  Defendant Uber Technologies is a Delaware Corporation with its Principle Place of Business in California.

**JURISDICTION AND VENUE**

Plaintiff seeks to enforce his rights under the Fair Labor Standard Acts and the Occupational Safety and Hazards Act.

i.  This court has subject matter jurisdiction under 28 U.S.C. § 1331(federal question jurisdiction) And 28 U.S.C. § 1367 (supplemental jurisdiction over state law claims).

ii.  This court has personal jurisdiction over all parties.

iii.  Venue is proper in this District pursuant to 28 U.S.C. § 1391(b).   All events set out below occurred within the District of Nevada. The contract between Plaintiff and Defendant was entered in Nevada.

**I.   MATERIAL FACTS**

1.  Defendant is an unregulated taxi operator.

2.  Plaintiff is a former taxi driver for Defendant. In or around January 2016, Plaintiff applied to drive for Defendant Uber.

3.  Defendant induced Plaintiff to apply to drive under Defendant's umbrella by advertising that drivers can make $35 per hour driving under Defendant's umbrella. Defendant continue to make this assertion even to this day.

4.  At the time of the application, Plaintiff was a registered owner of a 1999 Chevy Tahoe and a 1999 Mercedes Benz. Defendant required prospective drivers to have a 2006 or newer vehicle. Because none of Plaintiff's car was 2006 or newer,

have a 2006 or newer vehicle. Because none of Plaintiff's car was 2006 or newer, none of Plaintiff's cars could qualify. Plaintiff informed defendant that he intends to purchase a vehicle upon being approved to drive by defendant.

5. Defendant only approved those who pass background check to drive under its umbrella. As a result of Plaintiff's application, Defendant initiated a background check on Plaintiff.  A week or two after initiating background check, Plaintiff visited the Defendant's office to see whether background has been completed. Plaintiff was given a TNC sticker and an Uber emblem and asked to complete the tax information for my 1099 and set up a direct deposit for my pay. Plaintiff did as he was instructed. Part of that process included agreeing to an arbitration.

6. Plaintiff visited the Uber Partner's office on January 6, 2016 and was advised that the only thing remaining was for Plaintiff to register a vehicle before his account could be activated. Again, Plaintiff told Defendant that he is going to buy a new car.

7. Plaintiff was referred by Defendant to ABC 6825 Redwood St, Las Vegas, NV 89118. Plaintiff was told that ABC was working with Defendant to get drivers on the road. Plaintiff went to ABC Hyundai as instructed. However, the cheapest vehicle Plaintiff could find at ABC was a sedan selling for $24,000.

8. Plaintiff decided to look elsewhere.  That same day, Plaintiff went and bought a 2015 Kia Sorento from Hertz Car Sales at a cost of $17,000. After paying taxes and fees, Plaintiff was on the hook for $21,000.00.

9. On and around January 7, 2016, Plaintiff visited Uber Office where the car was inspected for safety by Defendant's mechanics. The car passed safety and was

approved for Uber services. That day, Plaintiff got two more Uber emblems and another TNC sticker.

10. On and around January 12, Plaintiff received a post adverse notice from Checkr, Inc. located at 2505 Mariposa Street, San Francisco, CA 94110. This was the company contracted by Defendant to conduct background check on prospective drivers.

11. Plaintiff had a 2010 conviction for reckless driving resulting from a DUI arrest in late 2009. This information was available on DMV Printout.

12. Plaintiff immediately wrote both Checkr and Uber asking them to reconsider because Plaintiff had relied to his detriment with Defendant's action of sending Plaintiff to a dealership to obtain a qualifying vehicle as an indication that he was good to go.

13. Plaintiff talked to Sherelle (Checkr) via email and Desiree (Uber Support) via email and phone. Plaintiff told them that he had already incurred a $21,000 car note in reliance with Uber's actions and communication with Plaintiff.

14. On Thu 21 Jan 2016, Plaintiff received an email from Uber declining his application to drive for Uber. As a result, Plaintiff's offer to drive for Defendant was rejected by Defendant and therefore no contract ensured.

15. Again, Plaintiff contacted Sherelle and Desiree. Plaintiff also visited the Uber's office in Las Vegas and asked them to reconsider. The purpose for which Plaintiff acquired the car was frustrated by Defendant's rejection of Plaintiff's offer.

16. Again, Plaintiff visited Defendant's office on Fort Apache to ask Defendant to reconsider. Defendant refused to reconsider. Instead, Plaintiff was asked to reapply if he thought something was wrong.

17. In April 2016, Plaintiff reapplied to drive for Defendant. On Apr 5, 2016, Plaintiff received an email that Checkr was again running his background check.

18. Before this background was completed, Plaintiff contacted Ally Finance, the bank that financed the Kia Sorento and informed them that he may have to return the vehicle because the purpose for which he had bought the car has been frustrated. When purchasing the car, Plaintiff had notified Hertzs car sales that he needed the car to drive for Uber. Plaintiff was given a toll-free number by the Ally agent to call so that Ally can come and pick up the car but was notified that it was going to affect Plaintiff's credit. As Plaintiff weighed whether to call the number and ruin his credit, Checkr completed Plaintiff's second background check. The same information that came out of the prior background check came out (the 2010 conviction for Reckless Driving).

19. Plaintiff received a text message from Defendant. The message wanted to know if I have a TNC sticker. Plaintiff replied in the affirmative. Another message came. It instructed Plaintiff to take the picture of the TNC sticker and send it as a reply to the text. Plaintiff did as instructed.

20. On Apr 7, 2016, Plaintiff received an email from Defendant. The email exclaimed, "Your background check has cleared!" In that email, Plaintiff was required to set up his tax preferences and link his bank account.  Because Plaintiff had already set up his tax preferences and linked his bank account when Defendant declined to enter into contract with him (back in January 2016). Plaintiff did not have to do

anything. Signing into his account indicated that everything was set to go. Thus, no new arbitration clause was filled by Plaintiff.

21. On or around April 8, 2016 Plaintiff was approved to drive for Uber. In reliance with that activation, Plaintiff decided to keep the Kia Sorento.

22. Defendant and Plaintiff entered into a taxi contract. The terms of that contract were that Plaintiff would receive 75% of the fares and Defendant would Keep 25% of the fares. This arrangement was quickly changed by defendants after Plaintiff started driving for Defendant. A few weeks after starting to drive for Uber, Plaintiff tried to log into Uber app. A message came indicating that before Plaintiff can log in, Plaintiff must accept the change in remuneration. Fare split was changed from 75%:25% to 65%:35%.

23. Each change in the contract be it for percentages, fares increases, or decreases has always been done been done through messages in the app. when the driver is logging into the app. to get to work. Each change has occurred without any consideration.

24. Plaintiff drove for Uber all of 2016 and all of 2017. All that time, Plaintiff maintained a rating of 4.9 out of 5.

25. During that time, Plaintiff could only carry passengers assigned by Defendant. It was made clear that any driver who carries a passenger outside the platform will be deactivated. As such Plaintiff could not pick up flags.

26. Defendant had sole discretion determine how much the customer will pay, Defendant could change fares at his discretion

27. Defendant maintained a disciplinary policy in the name of "things a driver could do to get excluded".

28. Defendant had sole discretion to determine how the money generated will be split. Defendant could void the contract at his discretion.

29. Defendant also punishes drivers for misconducts such as, being rude to a non-satisfactory job performance.

30. Defendant controls prices and monitors Drivers' performance like a traditional employer.

31. That Defendant had misclassified Plaintiff as an independent contractor and at the same time Defendant divested all economic opportunities for Plaintiff.

32. When determining amount that a driver gets, Defendant Uber calculates two fares for each ride — one charged to the passenger and a cheaper one used to determine the driver's pay. This has bee acknowledged by Defendant's spokesperson as quoted by Los Angeles Times. According to LA Times, spokesperson "acknowledged that the calculations used to determine what passengers are charged and what drivers are paid can differ."[1] This goes against

---

[1] Lawsuit accuses Uber of ripping off drivers, paying them smaller fares than what passengers pay, *available at*, http://www.latimes.com/local/lanow/la-me-uber-drivers-lawsuit-20170429-story.html (last visited 4/10/18).

Uber-Driver fare percentage splits as set by Defendant at the time of Plaintiff's application.

33. In a scheme meant to conceal tips given to the driver via Defendant's app., Defendant ensures that immediately after the ride, only the fare, minus the tips show up on the driver's app. Hours or days later, the tips show up on the app. In at least two occasions, passenger has shown the driver as she input the tip. For a Five Dollar tip, Plaintiff got a two dollars tip from Defendant. Defendant has been deducting drivers tips auto-collected from passengers under their rider agreement to further enrich itself.

34. Defendant only counts driving hours as hours when a driver has a passenger in direct violation of Department of Transportation's regulations. Even when Plaintiff is assigned a ride, the time taken to get to the passenger is not counted as on-duty-time.

35. Plaintiff never got a traffic ticket or got into an accident during the time he drove for Defendant.

36. On or around February 5, 2018, Plaintiff took the Kia Sorento for the annual safety check at Defendant's office at 1022 W Sunset Rd Ste 2 Sunset Plaza Henderson, NV 89014. Plaintiff's vehicle did not pass safety. He was instructed to install new tires and fix the airbag light on the dashboard. During this visit, also wanted to know whether as an independent contractor, Plaintiff can carry an Uber customer in conjunction with a Lyft customer (a pool ride).

37. Pool rides exists in Uber but only Defendant, not the driver, can put together a pool of riders. A pool ride occurs when Uber adds more passenger pick-ups in one ride. When that happens, a driver is paid one full fare for the first ride and $2.00 for each subsequent ride. Plaintiff learnt that none of the customers in a pool ride pays $2.00. Each passenger in the pool pays full fare minus $2.00 and Defendant use the rest of the money to enrich himself.

38. On February 7 2018, Plaintiff received an email from Checkr indicating that Checkr had initiated another background check against the Plaintiff. Plaintiff had not approved this background check neither was he consulted before the initiation.  However, Plaintiff was not concerned of the outcome because only items in the last background check were bound to come out since Plaintiff had not received any demerits on his driving record. After all, he had already driven for Uber for almost two years and maintained a 4.9 rating out of 5.0, with 1,106 rides delivered by Plaintiff in 2017 alone.

21. On February 16, 2018 Plaintiff received an email from the Defendant stating that Defendant was declining his application to drive for Uber. The only problem was that Plaintiff had been driving for Uber for two years and had not recently reapplied to drive for Uber.

22. Plaintiff immediately requested them to reconsider. In his request, Plaintiff pointed to the fact that he has been a driver for Uber for almost two years. That he maintained an impeccable record with a rating of 4.9 out of 5. The following day, Plaintiff received an email that my account has been reactivated. By then, Plaintiff had already installed new tires in his car and he had fixed his airbag light. Plaintiff went back to the Uber office on Fort Apache and submitted the car for

safety check. The car passed safety and Plaintiff's account was re-activated. However, the following morning, Plaintiff tried to log in to drive and a message popped up stating that he does not qualify to drive for Uber. His account was deactivated.

23. Plaintiff went to the Uber office in Henderson Nevada and was informed that that Uber had decided to discontinue the relationship. Just like that, Plaintiff was out of a job, and no severance pay was provided. In the meantime, Plaintiff is still making payments on the 2015 Kia Sorrento and not generating any income.

24. Wanting to have something on record on the driver's ability craft his or her own pool ride, Plaintiff also asked to Uber Support via email whether a driver can make an own pool. Plaintiff never received an answer from Defendant. Plaintiff tried to log into the driver app. to see if anything has changed. Instead, an arbitration clause popped up asking Plaintiff to accept. Plaintiff did not accept as it did not make sense for him to accept an arbitration clause from a company that had already fired him.

## II. CAUSES OF ACTIONS

### A. DETRIMENTAL RELIANCE

25. **Plaintiff incorporate by reference the allegation contained in paragraph 1 through 25 as if set forth verbatim herein.**

26. Plaintiff bought the car with specific intent to drive for the Defendant. Defendant led Plaintiff to believe that he was qualified to drive when Defendant sent Plaintiff to buy a car at ABC Hydai at 6825 Redwood St, Las Vegas, NV 89118.

Plaintiff bought the 2015 Kia Sorento in reliance with Defendant's referral.

27. Defendant's action of approving Plaintiff to drive prevented Plaintiff from returning the car to Ally Finance because the purpose for which the car was obtained was approved by defendant.

28. Defendant's act of deactivating plaintiff after two years of driving resulted in immediate harm to Plaintiff at Defendant's hands because Plaintiff continues to pay for the car he bought because Defendant promised that Plaintiff could drive under Defendant's umbrella.

29. Defendant caused Plaintiff harm;

30. Defendant therefore owes Plaintiff damages for detrimental reliance.

## B. BREACH OF CONTRACT

**30. Plaintiff incorporate by reference the allegation contained in paragraph 1 through 30 as if set forth verbatim herein.**

31. In April 2016, Plaintiff applied to drive for Defendant. Plaintiff underwent another background check by Defendant. Because Defendant had already declined Plaintiff's earlier application to drive for him, Plaintiff contacted Ally Finance, the bank that financed the Kia Sorento and informed them that he may have to return the vehicle because the purpose for which he had bought the car has been frustrated. When buying the car, Plaintiff had notified Hertzs car sales that he needed the car to drive for Uber. Plaintiff was asked by the Ally agent to call a toll-free number for them to come and pick up the car but was notified that it was going to affect Plaintiff's credit.

32. As Plaintiff weighed whether to call the number and ruin his credit, Checkr completed Plaintiff's second background check. This time around, Plaintiff was approved to drive for Defendant. With this approval, Plaintiff's Uber account was activated. As a result of that activation, Plaintiff decided to keep the Kia Sorento.

33. Plaintiff drove for Uber all of 2016 and all of 2017. All that time, Plaintiff maintained a rating of 4.9 out of 5 and all that time, and Plaintiff never got a traffic ticket nor get into an accident.

34. On or around February 5 2018, Plaintiff took the Kia Sorento for the annual safety check at Defendant's office at 1022 W Sunset Rd Ste 2 Sunset Plaza Henderson, NV 89014. Plaintiff's vehicle did not pass safety. He was instructed to install new tires and fix the airbag light on the dashboard.

35. During the visit to Defendant's office in Henderson NV, Plaintiff also wanted to know whether as an independent contractor, Plaintiff can carry an Uber customer in conjunction with a Lyft customer (a pool ride) since as a drive Plaintiff only get one payment on an Uber pool ride and Plaintiff learnt that each customer in a pool ride end up paying their own fares with the driver only get $2.00 for each subsequent customer who joins the pool which is a violation of the Uber-Driver ratio of splitting fares of 25:75 that Plaintiff was hired under.

36. Plaintiff also wrote this same question to Uber Support. Instead of an answer, Defendant emailed Plaintiff a bunch of agreements.

37. On February 7, I checked his emails and found that Checkr had again started a new background check on him. Plaintiff had not approved this background check, neither was Plaintiff consulted about this background check.

38. Plaintiff was not concerned of the outcome because only items in the last background check were bound to come out since Plaintiff had not received any demerits on his driving record. Furthermore, he had already driven for Uber for almost two years and maintained a 4.9 rating.

39. On February 16, Plaintiff received an email from Uber declining his application to drive for Uber. The only problem was that Plaintiff had been driving for Uber for two years and had not recently reapplied to drive for Uber.

40. Defendant breached its contract with Plaintiff and therefore the Court should assess damages against Defendant for that breach of contract.

### C. FRAUDULENCE INDUCEMENT

41. Plaintiff incorporate by reference the allegation contained in paragraph 1 through 4 as if set forth verbatim herein.

42. Defendant induced Plaintiff to apply to drive under Defendant's umbrella by promising that Plaintiff can make $35 per hour driving under Defendant's umbrella. In reality, a driver averages $3.75 an hour while driving under Defendant's umbrella.

43 Defendant's assertions that Plaintiff could make $35 an hour was a fraud intended to induce unsuspecting Plaintiff. Plaintiff was so induced and as a result, Plaintiff has suffered damages. Defendant is solely responsible for Plaintiff's harm and therefore the Court should make Defendant Pay.

### D. ECONOMIC DURESS

**44. Plaintiff incorporate by reference the allegation contained in paragraph 1 through 44 as if set forth verbatim herein.**

45. Defendant maintain a habit of placing conditions in the app as the driver is trying to log into the app. Because the driver only tries to log into Defendant's app. when driver is about to start work, driver is forced to accept whatever Defendant require he accept in order for driver to go to work. Thus, once the driver is induced into Uber and is bound by a car note that he acquired to get into Uber, Uber starts changing rates, the percentages it pays the driver, the additional fees that are deducted from the fare before it is split between Uber and the driver. Today, there is an Uber booking fee, an Uber service fee and Split fare fees. There is also a fee for cashing in what you have already earned.

46. This amounts to economic duress and therefore every agreement entered

between Plaintiff and defendant through the app. should be declared null and void because it was obtained through economic duress. It is either the driver agrees, or no work. No work means a driver risk having the car repossessed and his credit ruined.

**E. VIOLATION OF FEDERAL MINIMUM WAGE LAW**

**47.     Plaintiff incorporate by reference the allegation contained in paragraph 1 through 47 as if set forth verbatim herein.**

The Fair Labor Standards Act Mandates that employees be paid Federal Minimum wage and receive overtime pay for overtime work done.

48.     Defendant is an unregulated taxi company misclassified as a technology company.

49.     Plaintiff was a taxi driver working for Defendant and therefore Plaintiff's work follows the usual path of an employee of Defendant. Plaintiff was paid for each ride Plaintiff offered. Therefore, Plaintiff was a Piecemeal worker.

50.     Defendant is an employer for the purpose of Fair Labor Standard Act. Defendant maintains the ability to deactivate a driver, change the amount of money a driver can make at Defendant's sole discretion, and Defendant maintains exclusive control of how much the passenger must pay, Defendant decides how much a driver can earn from a ride, Defendant puts whatever amount it wants in driver's account, Even the tips generated and meant for the driver, Defendant pays the driver what Defendant wants.

51.     Defendant has divested all opportunities for Plaintiff to make money and therefore every money made by plaintiff comes from Defendant who makes money solely from taxi customers that are delivered by drivers.

52.     Plaintiff relationship with Defendant is an employee-employer relationship rather than that of an independent contractor. Where the work done, in its essence, follows the usual path of an employee, putting on an 'independent contractor' label does not take the worker from the protection of the Act. Rutherford Food Corp. v. McComb, 331

U.S. 722, 729, 67 S. Ct. 1473, 1476, 91 L. Ed. 1772 (1947). Plaintiff's work follows the usual path of an employee and therefore putting on an 'independent contractor' label does not take Plaintiff from the protection of the Act.

53.     Pursuant to 49 e-CFR Part 349 Section 395.2 on-duty time means all time a driver begins work or is required to be in readiness for work until the time the driver is relieved from work an all responsibilities for performing. For an Uber driver, that should include all times when the driver log into Defendant's app. because that is when a driver clocks into duty. As a result of Defendant well calculated efforts to circumvent the DOT regulations, An Uber hour could be anywhere from one hour to three hours. A driver can drive around for more than an hour, get a ride after waiting for the hour, and make $3.75 for that ride. To make $35.00 per hour as Defendant advertised, that could take up to 4 hours of work. Defendant violated both the minimum wage law for both Federal and Nevada and overtime pay.

54.     In the event the Court find that there is no enough control to declare defendant an employer, the Court should find that the  contractor relationship between Defendant and Plaintiff was illusory because Defendant maintained the ability to terminate the contract at Defendant's discretion as demonstrated by the fact that Defendant ended the contract with Plaintiff without provocation;  deactivate Plaintiff at Defendant's sole discretion;  determine how much fare is charged is charged to the customer unilaterally, and unilaterally determine how much Plaintiff will make from each ride.

55.     Once the contract is declared illusory, the only other relationship that would fall in is that of employer-employee because it would remain a fact that Plaintiff worked as a driver for Defendant. Furthermore, Defendant unilaterally has set up a minimum average rating for drivers in each city. If a driver's performance falls below the minimum after multiple notifications, driver will lose access to his or her account.

56.     Defendant has also created quality improvement courses that a driver must complete in order to regain access to his or her account. By Defendant's own policy, Defendant uses GPS technology to track every ride in what Defendant call a robust system of pre-screenings of drivers.[2] Uber tracks its drivers' patterns, so if drivers are constantly giving away free rides, the company will eventually notice. The most common case is riders who use the same driver on a regular basis and start to bypass the app and pay in cash. If Uber finds out, that's cause for deactivation. Defendant also maintains a dedicated incident response team on call 24/7 to investigate safety incidents.[3] Actions that threaten the safety of drivers and riders will be investigated and, if confirmed, lead to permanent deactivation of your account. A driver will be deactivated for using abusive language on a rider; for texting, calling, or visiting someone in person after a ride has been completed; for texting while driving; speeding or otherwise breaking local traffic laws; and using Uber to commit a crime, including drug and human trafficking or the sexual exploitation of children.  Any behavior involving violence, sexual misconduct, harassment, discrimination, or illegal activity while using Uber can result in the immediate loss of your account.[4]  Uber will also deactivate the account of any driver who receives several or serious complaints of poor, unsafe, or distracted driving while using the Uber app.  All the above constitute a disciplinary action.

57.     In Goldberg v. Whitaker House Co-op., Inc., the United States Supreme Court found that Members of a cooperative who performed homework and were paid on a piece-rate basis fixed by the cooperative for manufacturing items the cooperative desired, and who were subject to expulsion for substandard work or for failure to obey

[2] UBER COMMUNITY GUIDELINES: WHY DRIVERS CAN LOSE ACCESS TO UBER - US ONLY, available at, https://www.uber.com/legal/community-guidelines/us-en/ (last visited 4/25/18).

[3] See, Id.

[4] Id.

regulations, were "employees" of the cooperative within the Fair Labor Standards Act. Fair Labor Standards Act of 1938, §§ 3(d, e, g), 11(d) as amended 29 U.S.C.A. §§ 203(d, e, g), 211(d). Goldberg v. Whitaker House Co-op., Inc., 366 U.S. 28, 81 S. Ct. 933, 6 L. Ed. 2d 100 (1961). Similarly, here, Plaintiff was a Piecemeal worker and Defendant, by its policies can subject a driver to deactivation for substandard work or failure to obey regulations, and because Plaintiff has at least on one occasion been subjected deactivation because of an iPhone left in Plaintiff's car and was ultimately discharged. This are actions of control. Defendant should be held to Goldberg standards. Furthermore, Defendant reserves within its policies a right to expel a driver for substandard work or failure to obey regulations and therefore Defendant is an employer pursuant to Goldberg standards. Apply the economic reality test to these facts will indicate that Plaintiff was Defendant's employee not independent contractor, for an independent contractor has rights under the law that defendant chose to reserve to himself.

**F.    SIXTH CAUSE OF ACTION FOR WILLFUL VIOLATION OF THE FEDERAL OCCUPATIONAL SAFETY AND HEALTH ACT (OSHA).**

Plaintiff incorporate by reference the allegation contained in paragraph 1 through 58 as if set forth verbatim herein.

59.    Because Defendant-Plaintiff relationship was that of Employer-Employee, it brought Defendant within the Federal Occupational Safety and Health Act (OSHA). OSHA requires employers to provide tools and equipment that are in safe working condition to their employees. However,

60.    Defendant required Plaintiff to provide equipment (the 2015 Kia Sorento) as well as to ensure the equipment is in good working condition.

61.    The Defendant abdicated its duty as employer under the act.

62.    Defendant violated OSHA and therefore Defendant should be made to pay for

the Kia and reimburse Plaintiff for the money Plaintiff has paid on Defendant's behalf. Plaintiff also seek punitive damages for Defendant's willful violation.

### G.    SEVENTH CAUSE OF ACTION FOR WRONGFUL TERMINATION

Plaintiff incorporate by reference the allegation contained in paragraph 1 through 62 as if set forth verbatim herein.

By referring Plaintiff to a car dealership to buy a car and hiring Plaintiff to be his driver, Defendant acted in a way that created a reasonable expectation that Plaintiff would continue to be employed as long as he abided with Defendant's policies.

63.    Plaintiff did not violate any of Defendant's policies and therefore Defendant was wrongfully terminated. Plaintiff urges the Court to require Defendant to compensate Plaintiff for lost income caused by the wrongful termination of Plaintiff by Defendant.

64.    Plaintiff also asks the court to grant tremble and punitive damages to Plaintiff against Defendant for this wrongful termination.

### H. EIGHTH CAUSE OF ACTION FOR FRAUD.

**Plaintiff incorporate by reference the allegation contained in paragraph 1 through 64 as if set forth verbatim herein.**

65.    When determining amount that a driver gets, Defendant Uber calculates two fares for each ride — one charged to the passenger and a cheaper one used to determine the driver's pay. This has been acknowledged by Defendant's spokesperson as quoted by Los Angeles Times. According to LA Times, spokesperson "acknowledged that the calculations used to determine what passengers are charged and what drivers are paid can differ."

66.    This goes against Uber-Driver fare percentage splits as set by Defendant at the time of Plaintiff's application.

67.    Defendant has been defrauding Plaintiff off earned income and therefore Plaintiff urge the court to find that Defendant owes Plaintiff restitution and to award Punitive

damages against Defendant.

I.     **NINTH CAUSE OF ACTION FOR EMBEZZLEMENT**

**Plaintiff incorporate by reference the allegation contained in paragraph 1 through 67 as if set forth verbatim herein.**

68.     In a scheme meant to conceal tips given to the driver via Defendant's app., Defendant ensures that immediately after the ride, only the fare, minus the tips show up on the driver's app. Hours or days later, the tips show up on the app. In at least one occasion that Plaintiff has been able to see passenger input the tip, Passenger keyed in $5.00 tip, but Defendant only applied a $2 to Plaintiff's account. The tip was given by the customer to the driver and therefore Defendant was a bailee.

69.     Defendant has been deducting drivers tips auto-collected from passengers under their rider agreement to further enrich itself.

70.     NRS 205.300 defines the crime of embezzlement as follows: 'Any bailee of any money… who shall convert the same to his own use, with intent to steal the same or to defraud the owner or owners thereof… shall be guilty of embezzlement. * * *' (Emphasis added). Livingston v. State, 84 Nev. 403, 405, 441 P.2d 681, 682 (1968).

71.     Defendant converted Plaintiff's money with intent to defraud Plaintiff, the rightful owner and therefore Defendant is guilty of embezzlement.


**Dispositive Motion I**

Plaintiff incorporate by reference the allegation contained in paragraph 1 through 71 as if set forth verbatim herein.

72.     Plaintiff challenges the arbitration clause embedded in a contract that Defendant never agreed to. 9 U.S.C.A. § 2 "permits arbitration agreements to be declared unenforceable "upon such grounds as exist at law or in equity for the revocation of any contract." This saving clause permits agreements to arbitrate to be invalidated by

"generally applicable contract defenses, such as fraud, duress, or unconscionability,"
AT&T Mobility LLC v. Concepcion, 563 U.S. 333, 339, 131 S. Ct. 1740, 1746, 179 L. Ed. 2d
742 (2011). Here, Plaintiff challenges the arbitration clause based on contract formation
theories as exist at law.

73.     In determining the enforceability of an arbitration clause, the Court must
determine whether the arbitration agreement at issue "clearly and unmistakably"
evince petitioner's and respondent's intent to submit questions of arbitrability to the
arbitrator? Rent-A-Ctr., W., Inc. v. Jackson, 561 U.S. 63, 80, 130 S. Ct. 2772, 2784, 177 L.
Ed. 2d 403 (2010). Because Defendant declined an Plaintiff's offer to drive for him, and
the arbitration clause was part of that offer (the application process), Defendant killed
the arbitration clause and therefore defendant cannot take shelter in an arbitration
clause that Defendant did not ascent to.

74.     In determining the validity of an arbitration clause, the court should utilize the
standards of Rent-A-Ctr. In that case, the United States Supreme Court stated that when
a party raises a good-faith validity challenge to the arbitration agreement itself, that
issue must be resolved before a court can say that he clearly and unmistakably intended
to arbitrate that very validity question. Rent-A-Ctr., W., Inc. v. Jackson, 561 U.S. 63, 82,
130 S. Ct. 2772, 2785, 177 L. Ed. 2d 403 (2010). In this case, the Court should look at the
arbitration clause as part of the contract.

75.     If the contract never matured, then even the arbitration clause never matured.
For without the contract, there was no need for an arbitration clause. In this case, the
arbitration clause was embedded in an application process that did not lead to
formation of a contract and therefore the arbitration clause died at formation.

76.     In that application, Plaintiff made an offer to drive for Defendant. Defendant
declined Plaintiff's offer. Because Defendant was the one who declined Plaintiff's offer
to drive for Defendant, and that offer included the arbitration clause, Defendant cannot

be allowed to benefit from an arbitration clause in an offer that Defendant did not accept.

77.     Defendant cannot rely on an arbitration clause in an offer that Defendant declined to compel arbitration because that arbitration clause died with the rejection of an offer. Because Plaintiff did not accent to an arbitration clause the second time when he reapplied to drive for defendant, Plaintiffs contract with Defendant when Plaintiff was ultimately hired by Defendant is not governed by an arbitration clause.

78.     Defendant did not require Plaintiff to accept an arbitration clause. Thus, the only arbitration clause that Plaintiff signed was that which was presented to him when he was applying to drive for Defendant the first time.

79.     Also, because Plaintiff has raised a claim of fraudulent inducement, the fact that the agreement contract terms are so one-sided, and fraud, the same standards in Rent-A-Ctr. Should be followed. In that case, the court stated that, "if the terms of the agreement are so one-sided and the process of its making so unfair—it would contravene the existence of clear and unmistakable assent to arbitrate. *Id*. Here, Defendant is the drafter of the arbitration clause, the arbitration clause has no purpose but to shield Defendant from willful violation of laws.

80.     Defendant has changed terms of the arbitration clause on numerous occasion since Plaintiff first applied to drive. Every time Defendant does that, Defendant deletes the old arbitration clause.

81.     Currently, Driver's operates with a 2017 arbitration clause.  This arbitration clause is also part of the application process.

82.     That arbitration clause reads in part, "if Uber changes this Arbitration Agreement after the date you first agreed to the Terms (or to any subsequent changes to the Terms), you may reject any such change by providing Uber written notice of such rejection within 30 days of the date such change became effective, as indicated in the

"Effective" date above. This written notice must be provided either (a) by mail or hand delivery to our registered agent for service of process, c/o Uber USA, LLC (the name and current contact information for the registered agent in each state are available online here), or (b) by email from the email address associated with your Account to: change-dr@uber.com."[5]

83.     The fact that Defendant has discretion to change this arbitration clause without any consideration for the driver makes the arbitration clause illusory. Furthermore, for a person with an Uber account, like Plaintiff did, the 2017 arbitration clause is designed to deceive a driver. Once a driver gets to the opens the Sing up now page of the app, a message pops up. The message states, "By proceeding, I agree that Uber or its representative may contact me by email, phone...I have read and understand Uber Privacy Policy." In that privacy policy, there is no arbitration clause.

84.     The arbitration clause is buried in "Legal." For an agreement whereby, a worker is signing off all his or her rights to judicial process, at the very least, the arbitration clause should not be buried but rather should have had a clear notice just like the Uber Privacy Policy.  The Privacy Policy is also matters legal, yet, Defendant artfully displays the privacy policy so that that is what a driver will concentrate on.

85.     Legal does not mean arbitration and since arbitration in this case means losing a lot of rights, Defendant should have clearly displayed the arbitration clause just like Defendant clearly displayed the privacy notice. Defendant did that to divert the attention of drivers from the arbitration clause.

86.     The Court should find that the arbitration clause died at formation, that the arbitration clause was illusory, and that despite the fact that defendant's arbitration clause takes all rights to judicial process for a driver, Defendant failed to provide proper

---

[5] U.S. Terms of Use; Effective: December 13, 2017, available at,

https://www.uber.com/legal/terms/us/ (last visited 4/26/18).

notice like Defendant has done with the privacy notice and therefore when Driver is filling an application, a driver is not informed that he or she is giving up all rights to seek recourse in the courts.

87.     Plaintiff pray that the Court find Plaintiff's contract with Plaintiff is not governed by an arbitration clause.

**Dispositive Motion II**

Plaintiff incorporate by reference the allegation contained in paragraph 1 through 87 as if set forth verbatim herein.

88.     Plaintiff is branded Defendant's partner, hence the reference "Uberpartner". Yet, Plaintiff had no partnership rights. Even if it is to be agreed that Plaintiff was a partner, Defendant acted in a way that harmed Plaintiff by lowering fares at Defendant's discretion.

89.     Defendant also calls Plaintiff an independent contractor. Yet, Defendant has usurped all economic opportunities for Plaintiff. Plaintiff cannot pick up a flag. Plaintiff cannot decide how much to charge for his service. In N.L.R. B. v. Friendly Cab Co, the Ninth Circuit Court of Appeals reached a conclusion that taxi drivers were not independent contractors, despite the fact that the drivers leased their vehicles and made their own schedules. According to the court, that conclusion was supported by substantial evidence that Friendly exercised considerable control over the means and manner of its drivers' performance and **did not provide its drivers the ability to pursue entrepreneurial opportunities**. N.L.R.B. v. Friendly Cab Co., 512 F.3d 1090, 1093 (9th Cir. 2008).

90.     Defendant is a tax cab company that does not want to provide its drivers with vehicles to do the job.

91.     As the U.S. Supreme Court has stated, "Where the work done, in its essence,

follows the usual path of an employee, putting on an 'independent contractor' label does not take the worker from the protection of the Act." Rutherford Food Corp. v. McComb, 331 U.S. 722, 729, 67 S. Ct. 1473, 1476, 91 L. Ed. 1772 (1947).

92.     Defendant is not a technology company because it derives all its income on for-hire driver fees.

93.     Plaintiff was a taxi driver for Defendant.

94.     In Association Professional Elite Taxi v Uber Systems Spain SL, 615CJ0434, the European Court of Justice found that Uber is a taxi company.

94.     Because Defendant generates its income from fares collected by drivers like Plaintiff.

96.      Plaintiff ask the Court to rule that Uber is a taxi company and not a technology company and that a taxi driver-taxi company relationship existed between Plaintiff and Defendant.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for Judgement against the Defendant as follows;

1. For Compensatory damages, including but not limited to, lost back pay, unpaid fringe benefits plus interest, and future lost earnings and fringe benefits;

2. For Punitive damages allowed by law;

3. For restitution and/or disgorgement;

4. Severance pay;

5. For an award of prejudgment and post-judgement interest; and

6. For an award to Plaintiff of such other and further legal and equitable relief as the Court deems just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby request trial by Jury.


RESPECTFULLY SUBMITTED this 7th Day of May, 2018.


By:_____
Peter Mwithiga
Pro Se.